Filed 5/23/13  P. v. Ramirez CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B234054 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA090622) |
| v. | |
| JOE RAMIREZ, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tia Fisher, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Joe Ramirez, Jr., appeals his conviction for gross vehicular manslaughter, leaving the scene of an accident, hit and run driving, and felon in possession of a loaded firearm, with enhancements for prior prison terms and fleeing the scene of a vehicular manslaughter (Pen. Code, §§ 192, subd. (c)(1), 12031 (former), 667.5; Veh. Code, §§ 20001, subds. (a) & (c), 20002).[1] He was sentenced to state prison for 13 years, 8 months.

The judgment is affirmed.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *The traffic accident.*

On February 22, 2010, Angela Posada and her boyfriend Gustavo Cesena went to defendant Ramirez's house in Baldwin Park. Cesena and Ramirez were friends. At about 9:00 p.m., Posada, Cesena, Ramirez and Edward Kim drove in Kim's Honda Accord to a storage unit in Walnut. Ramirez and Kim got out. When they returned, they placed something inside the passenger side door panel of the Accord. Ramirez was now driving with Kim in the front passenger seat, and Cesena and Posada in the back. Ramirez took Grand Avenue to the entrance of the 10 freeway. The on-ramp consisted of two lanes which then merged into a single freeway lane.

As Edgar Ferman entered the on-ramp, a Honda Civic driven by Gary Chaboya was in front of him. Ferman saw Ramirez come speeding up from behind, move into the right lane in order to pass him, and then pass Chaboya's Civic by driving on the shoulder. As Ramirez passed the Civic he sideswiped it. Chaboya first noticed the Accord when it hit the passenger side of his car as he was about to enter the freeway.

Ramirez accelerated onto the freeway and turned off all the Accord's lights. Chaboya chased the Accord because he was angry it had not stopped after hitting his car.

---

[1]      All further references are to the Penal Code unless otherwise specified.

He sped up, trying to read the Accord's license plate number, but Ramirez seemed to be trying to evade him by weaving in and out of traffic without using his turn signals. The Accord veered toward the Barranca Avenue exit, but then suddenly merged back onto the freeway, continuing to weave in and out of traffic and almost hitting other cars. The Accord then veered toward the Citrus Avenue exit, but it again merged back onto the freeway, driving almost out of control.

Ferman saw the Accord switch lanes approximately 12 times, sometimes making one lane change and sometimes making multiple lane changes. Most of the time the Accord was driving less than a single car length behind the other cars on the freeway. Chaboya saw the Accord almost collide with two cars. Posada testified Ramirez was driving recklessly and extremely fast, and that Cesena told Ramirez to slow down.

Ramirez lost control of the Accord when he swerved to avoid a pickup truck. He spun out, hit a cinderblock sound wall, bounced back onto the freeway, and collided with Chaboya's Civic. Posada, who had been knocked unconscious by the collision, awoke to hear Ramirez telling her to hurry up and go. Ramirez and Kim climbed out the car windows and fled. When Posada tapped Cesena's leg to tell him they had to go, there was no response. Then she saw Cesena's face had been crushed and she realized he was dead.

2. *The investigation.*

Police found a 190-foot-long debris field at the scene, consisting of vehicle parts and fluids from Kim's Accord and Chaboya's Civic. There was a three-foot wide hole in the sound wall. Cesena, who had not been wearing a seat belt, was partially decapitated by the roof of the Accord and died almost instantaneously. The distance between the Grand Avenue on-ramp, where Ramirez entered the freeway, and the location of the crash was about a mile.

A tow truck driver transported the Accord to a storage yard. At the yard, the driver heard the ringing of a cell phone from inside the Accord. He saw a cell phone on the front passenger seat and a handgun inside a passenger door panel.

3

3. *Prior conduct evidence.*

On December 11, 2008, Baldwin Park Police Officer Jorge Huerta saw two motorcycles exit the 10 freeway and roll through a stop sign. Huerta turned on his emergency lights to initiate a traffic stop. One of the motorcycles stopped but the other one, which was being driven by Ramirez, kept going. With Huerta chasing him, Ramirez drove 80 to 100 mph, ran red lights and a stop sign, and crossed double yellow lines into oncoming traffic. Ramirez finally lost control of the cycle when he tried to avoid a collision with another vehicle at an intersection. He hit a parked car, flipped over, and then ran off. Huerta caught him a block and a half from the accident scene.

4. *Sentencing.*

The jury acquitted Ramirez of murder, but convicted him of gross vehicular manslaughter, leaving the scene of an accident and possession of a concealed loaded firearm by a felon. Defense counsel urged the trial court to impose something less than the maximum possible sentence, which was 13 years, 8 months in prison, plus 6 months in county jail, arguing Ramirez had taken part in a substance abuse treatment program while incarcerated, that Cesena's death had resulted from unusual circumstances because Ramirez was being chased down the freeway by Chaboya, and that none of Ramirez's prior convictions involved violence. The prosecutor asked the trial court to impose the maximum term. Cesena's father told the court he and his wife had forgiven Ramirez.[2]

The trial court announced it would impose the maximum term because of Ramirez's prior "reckless, evasive, dangerous driving," and the fact his "conduct [this time] could have resulted in the death of anyone who was out there on the road that night . . . from a public safety standpoint . . . ." While acknowledging Chaboya had been

---

[2]     Cesena's father said: "What I would say on behalf of . . . his mother and I, not everybody feels the same way we do is we forgive him. My son would forgive him because he was a real good friend of his." "And he loved his friend. And I just wish he wouldn't have left him like an animal tossed on the side of the road. I wish he would have stood there and been a man and did what he had to do, but I'm not hateful towards him and we don't feel that my son would want us to be."

4

chasing Ramirez down the freeway, the trial court said Ramirez "had options, and those options included not going [on], pulling over . . . ." The court also noted Ramirez's record of parole violations.

The trial court imposed an upper term of six years for the gross vehicular manslaughter conviction, enhanced by a consecutive five-year term for having fled from the accident scene. (Veh. Code, § 20001, subd. (c).) To this principal term, the court added a consecutive term of eight months for the felon in possession of a firearm conviction, and two consecutive one-year terms for the prior prison term enhancements. This amounted to a total prison term of 13 years and 8 months.

## CONTENTIONS

1. The trial court erred by not striking the prior prison term enhancements.

2. The trial court erred by imposing an aggravated term on the gross vehicular manslaughter conviction.

3. Ramirez was entitled to additional presentence custody credits.

## DISCUSSION

1. *Prior prison term enhancements were properly imposed.*

Ramirez contends the trial court abused its discretion by imposing, rather than striking, two prior prison term enhancement sentences (§ 667.5). This claim is meritless.

"The enhancement language in section 667.5 is mandatory unless the additional term is stricken," and "a section 667.5, subdivision (b) prior prison term enhancement may be stricken pursuant to section 1385, subdivision (a). [Citations.]" (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1561.) "[A] court's failure to dismiss or strike a prior conviction allegation is subject to review under the deferential abuse of discretion standard." (*People v. Carmony* (2004) 33 Cal.4th 367, 374.)

"In reviewing for abuse of discretion, we are guided by two fundamental precepts. First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be

5

set aside on review." ' [Citations.] Second, a ' "decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony, supra,* 33 Cal.4th at pp. 376-377.)

The Attorney General argues, "Nothing about appellant's history or the instant offenses warranted the trial court to strike appellant's prior prison term enhancements in furtherance of justice. Appellant's criminal history spans his entire adulthood and into his minority." According to the probation report, Ramirez's record has been pervasive, including: a sustained juvenile petition for battery (§ 242) in 1998; a theft conviction (§ 484) in 1999; conviction on two counts of burglary (§ 459) in 2004; a subsequent probation violation on the burglary convictions resulting in a prison sentence; a 2006 conviction for possession of controlled substance paraphernalia (Health & Saf. Code, § 11364); a parole violation in January 2007; a parole violation in December 2007; a 2008 felony conviction for taking a vehicle without the owner's consent (Veh. Code, § 10851) resulting in a two-year prison term. Ramirez subsequently violated parole and was returned to prison. In 2010, Ramirez was convicted of evading a police officer in a reckless manner (Veh. Code, § 2800.2).[3] He was on parole at the time he committed the instant offense.

Ramirez argues the trial court should have stayed imposition of the two prior prison term enhancements because, although his conduct was grossly negligent and had resulted in a death, he "did not intend to kill Cesena and was very remorseful for causing the death of his friend. More importantly, Mr. Cesena's family forgave appellant for his conduct . . . . [and Ramirez] had no prior history of violence or assaultive conduct as an

---

[3]     This conviction does not appear in the probation report, where the criminal history only goes up through 2008.

6

adult. He was 29 years old at the time of the offense. . . . [H]is criminal history was not significant or extensive and clearly showed no indication of a predisposition toward violent conduct. [¶] Moreover, while in custody, appellant had sought to better himself and made changes to increase his success on the outside."

But a lack of prior assaultive crimes would not be particularly relevant because it is clear Ramirez had no intention of harming Cesena. What is relevant, however, is the fact Ramirez was convicted in 2010 for evading a police officer by means of reckless driving. The incident giving rise to this conviction occurred a mere 14 months before the present incident, in which it is clear Ramirez's reckless driving while trying to flee the scene of his hit-and-run offense directly resulted in Cesena's death. We do not see why Ramirez's age, 29 years old at the time of the offense, should be viewed as a mitigating factor; he was surely old enough to know better. Furthermore, it appears Cesena's entire family had not, in fact, forgiven Ramirez. Although Cesena's father and mother told the trial court they forgave him, Cesena's father also said "not everybody feels the same way we do," an apparent reference to another family member.[4]

The trial court did not abuse its discretion by refusing to strike the two prior prison term enhancement terms.

2. *Upper term on vehicular manslaughter conviction was proper.*

Ramirez contends the trial court erred by imposing an aggravated term on count 2, his conviction for gross vehicular manslaughter. This claim is meritless.

a. *Background.*

The probation report found no mitigating factors and the following aggravating factors: the crime involved great bodily harm; Ramirez had served a prior prison term; Ramirez was on parole when the crime was committed; and, Ramirez's prior performance on probation and parole had been unsatisfactory.

---

[4] There was this colloquy:
"The Court: And then I also recognize that there are people, brother [*sic*] who have come to court and are just not at that same place.
"Mr. Cesena: No, they're not."

7

The trial court explained its decision to impose an aggravated six-year term on count 2 by noting Ramirez's recent conviction for "reckless, evasive, dangerous driving," and the fact his "conduct could have resulted in the death of anyone who was out there on the road that night . . . from a public safety standpoint . . . of dangerousness." The trial court noted Ramirez "has also had violations of parole, has not been compliant with terms and conditions that have been set for him in the past."

        b. *Legal principles.*

" 'Sentencing courts have wide discretion in weighing aggravating and mitigating factors [citations], and may balance them against each other in "qualitative as well as quantitative terms" [citation] . . . . We must affirm unless there is a clear showing the sentence choice was arbitrary or irrational.' [Citations.]" (*People v. Avalos* (1996) 47 Cal.App.4th 1569, 1582.) A single aggravating factor supported by substantial evidence is sufficient to impose either an upper term or a consecutive term. (*People v. Osband* (1996) 13 Cal.4th 622, 732; *People v. Jones* (2009) 178 Cal.App.4th 853, 863, fn. 7 [only single aggravating factor needed to impose aggravated term].) "A fact is aggravating if it makes defendant's conduct distinctively worse than it would otherwise have been." (*People v. Zamarron* (1994) 30 Cal.App.4th 865, 872.)

        c. *Threat of great bodily injury.*

California Rules of Court, rule 4.421, provides: "Circumstances in aggravation include factors relating to the crime and factors relating to the defendant. [¶] (a) Factors relating to the crime, whether or not charged or chargeable as enhancements include that: (1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness; . . ."

Ramirez contends the trial court improperly relied on the threat of great bodily injury as an aggravating factor. He correctly points out this factor could not have been properly based on the injury to Cesena because gross vehicular manslaughter, by definition, involves the death of a human being. "Bodily harm resulting in death is an element of felony vehicular manslaughter. *Reliance upon that fact alone* is improper when trying to aggravate a term of imprisonment." (*People v. McNiece* (1986)

8

181 Cal.App.3d 1048, 1061, disapproved on other grounds in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12 and *People v. McFarland* (1989) 47 Cal.3d 798, 804-805.)

However, it was proper to aggravate Ramirez's sentence based on the risk of harm he posed to other motorists on the road that night, as well as to his passengers other than Cesena. In *People v. Ortiz* (2012) 208 Cal.App.4th 1354, the defendant had been convicted of kidnapping during a carjacking, evading an officer with reckless driving, and carrying a firearm in a vehicle. During sentencing, the trial court said "the entire population of people on the freeway at the time, including the police officers chasing them and the individuals in the car, were put at risk . . . ." (*Id*. at p. 1373.) *Ortiz* held that, based on this statement, the trial court "could have cited as reasons for imposing the upper . . . term" both California Rules of Court, rule 4.421(a)(1) (offense involved high degree of callousness) and rule 4.421(b)(1) (conduct was extremely dangerous to society). (*People v. Ortiz, supra,* at p. 1373.) *Ortiz* stated: "We believe the extreme danger to which the public was exposed would have, by itself, constituted an adequate ground for imposing the upper term." (*Id*. at p. 1374.)

Ramirez asserts: "The trial court's reliance on the *threat* of great bodily harm to others in the vehicle or on the freeway at the time of the collision was unjustified . . . . where the defendant did not intend to do anyone any harm." He argues: "The presence of the word 'or' in subdivision (a)(1) of rule 4.421, where that subdivision states '[t]he crime involved . . . threat of great bodily harm *or* other acts disclosing a high degree of cruelty, viciousness, or callousness' further suggests the requirement of an actual malicious intent to do great bodily harm. The concepts of cruelty and viciousness clearly require an intent to harm. There was no evidence . . . appellant had any intent to do harm to anyone. Thus, this subdivision was inapplicable."

We disagree. Ramirez is ignoring the third alternate term provided by this rule: "or other acts disclosing a high degree of cruelty, viciousness, or *callousness*." Although "cruelty" and "viciousness" connote an intent to do harm, "callousness" does not because, in this context, it means a disregard or lack of sympathy for others. That is, it connotes bringing about an unintentional harm because the defendant was indifferent to

9

the risk of causing harm to others (See, e.g., *People v. Esquibel* (2008) 166 Cal.App.4th 539, 558 [noting "callous" is typically defined as "insensitive, indifferent or unsympathetic"].)  In this case, Ramirez drove erratically, recklessly and dangerously down a crowded stretch of freeway.  His driving posed a danger to other vehicles, as well as to the other passengers in his own car apart from Cesena.  Ramirez's conduct was certainly callous.

> d. *Ramirez's prior dangerous driving*.

Ramirez argues the trial court improperly relied on his history of reckless, evasive or dangerous driving because "[i]t is improper to impose the upper term based on facts which are an inherent part of the charged offense."  According to California Rules of Court, rule 4.420(d), a "fact that is an element of the crime . . . may not be used to impose a greater term."  But Ramirez's prior reckless driving is not an element of gross vehicular manslaughter.  Section 192, subdivision (c)(1), defines gross vehicular manslaughter as "driving a vehicle in the commission of an unlawful act, not amounting to felony, and with gross negligence; or driving a vehicle in the commission of a lawful act which might produce death, in an unlawful manner, and with gross negligence."  CALCRIM No. 592 provides:  "To prove that the defendant is guilty of gross vehicular manslaughter, the People must prove that:  [¶]  1 The defendant (drove a vehicle/operated a vessel); [¶] 2 While (driving that vehicle/operating that vessel), the defendant committed (a/an) (misdemeanor[,]/ [or] infraction[,]/ [or] otherwise lawful act that might cause death); [¶] 3 The defendant committed the (misdemeanor[,]/ [or] infraction[,]/ [or] otherwise lawful act that might cause death) with gross negligence; [¶] AND [¶] 4 The defendant's grossly negligent conduct caused the death of another person."

Ramirez's conduct of speeding down the 10 freeway at night with his lights off, while making erratic lane changes and engaging in other reckless driving techniques, constituted gross negligence.

e. *Ramirez's "options" other than to continue driving.*

Ramirez argues the trial court erred in relying on the fact he had "options" other than to continue driving down the freeway. Ramirez asserts this constituted using an element of the offense to aggravate his sentence because "the crime could not have been committed without appellant first making a decision to continue driving, rather than pulling over while he was being chased by Chaboya. It was appellant's decision to continue driving which led to his commission of gross vehicular manslaughter. Thus, the fact that he continued to drive at speeds in excess of the posted speed limits and make unsafe lane changes was an essential element of the charged offense. Had appellant stopped, there would have been no crash and no crime."

Ramirez is reading too much into the trial court's comment, which was an apparent response to defense counsel's argument the trial court should "consider a factor in mitigation related to the circumstances of this crime which was that it was committed because of an unusual circumstance, that being the driving of Mr. Chaboya behind Mr. Ramirez on the date of the incident which was dangerous driving as well, and I would argue somewhat of a provocation. And I'd ask the court to consider that factor in mitigation." The trial court was apparently rejecting this "provocation" argument on the ground Ramirez could have simply pulled over rather than trying to outrun Chaboya.

3. *Ramirez was not entitled to additional presentence custody credits.*

Ramirez contends the failure to award him additional days of presentence custody credit in accordance with the newest version of section 4019 violated his equal protection rights. However, he has conceded in his reply brief that, after the recent decision in *People v. Brown* (2012) 54 Cal.4th 314, this contention is meritless. *Brown* concluded a prior version of section 4019 applied prospectively only and that prospective application did not violate equal protection. (See *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1551 [concluding "*Brown*'s reasoning and conclusion apply equally to current section 4019"].)

11

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

KITCHING, J.

ALDRICH, J.